NORTHERN OHIOANS PROTECTING THE
ENVIRONMENT ET AL., APPELLANTS, *v.*
SHANK, DIRECTOR OF
ENVIRONMENTAL PROTECTION, ET AL.,
APPELLEES.

(Nos. 87AP-1051, 87AP-1052,
87AP-1053, 87AP-1054 and
87AP-1055—Decided June 30, 1988.)

*Nick Batt,* for appellants.
*Anthony J. Celebrezze, Jr.,* attorney general, *Lauren Palik Alterman* and *Jack Van Key,* for appellee Shank, Director.
*Smith & Schnacke* and *John W. Edwards,* for appellees Chemical Waste Management, Inc. et al.

WHITESIDE, P.J. Appellants, Northern Ohioans Protecting The Environment ("NOPE"), Merle Pearson, Kathryn Pearson and William Warner, appeal a decision of the Environmental Board of Review ("EBR") and raise two assignments of error, as follows:

"I. The Environmental Board of Review erred in finding that the facility could be operated under a part A permit since it was not continuously in operation since before 9, 1980 [*sic*].

"II. The Environmental Board of Review erred in finding that the director acted lawfully when he issued per-

mit [*sic*] in its final form in which the terms and conditions of said permit did not comport with the prior classification of the changes as a revision rather than a modification."

Appellee, Chemical Waste Management Holdings, Inc., operates a hazardous-waste facility in Vickery, Ohio. The facility began operation in 1964 as an oil reclamation facility and, eventually, began receiving liquid waste utilizing lagoons, tanks and deep-well injection to treat the waste. Waste Management, Inc. acquired the facility in 1978 and subsequently transferred ownership of the facility to its subsidiary, Chemical Waste Management, Inc. ("CWM, Inc.").

In 1981, CWM, Inc. received an interim status "part A" Hazardous-Waste Installation and Operation Permit for the Vickery facility. The Vickery facility had continuously stored, treated and disposed of hazardous waste prior to October 9, 1980, and has continued to do so up to the present time. In September 1984, under a consent degree obtained by the Director of the Environmental Protection Agency ("EPA") in the Sandusky County Common Pleas Court, CWM, Inc. stopped accepting new waste at the Vickery facility, although the facility continued to dispose of waste that previously had been accepted and stored at the facility. In 1986, title to the property of the facility was transferred to Chemical Waste Management Holdings, Inc. ("CWMH, Inc."), a wholly owned subsidiary of Waste Management, Inc. In 1986, CWMH, Inc. requested changes to its "part A" permit. The Director of the EPA classified the changes as revisions and issued a revised "part A" permit. The Vickery facility began receiving waste under the revised permit in April 1987.

Appellants appealed the director's action to the EBR which, on September 8, 1987, upheld the director's action, specifically stating in its conclusions of law:

"40. Based upon the evidence presented in this case, the CWM facility was receiving hazardous waste immediately prior to October 9, 1980. As a result, the facility was 'in operation' immediately prior to October 9, 1980 for purposes of OAC 3745-50-41 and Ohio Revised Code Section 3134.05. CWM was properly granted a 'part A' permit for its facility. The fact that CWM facility did not accept new hazardous waste for a period of time after interim status had been properly granted did not affect the validity of that interim status."

The EBR also found that the changes did not affect the siting criteria of R.C. 3734.05(C)(6), and found that the action of the director was therefore lawful and reasonable and the changes constituted a revision and not a modification of the permit.

The court is required by R.C. 3745.06 to "affirm the order [of EBR] complained of in the appeal if it finds, upon consideration of the entire record and such additional evidence as the court has admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with the law." The facts in this case are not in dispute and the issues require this court to review the decision of the EBR to determine whether the decision was in accordance with the law.

Appellants, in their first assignment of error, contend that the EBR erred in finding that CWMH, Inc. could operate under a "part A" permit since the facility was not "continuously in operation" since before October 9, 1980. Appellants assert that because the Vickery site was no longer receiving hazardous waste after the consent decree, it was no longer "in operation" as that term is defined by the Ohio Ad-

ministrative Code and that the inability of the Vickery site to receive hazardous waste for a period of time greater than ninety days "triggered" the closure requirements under Ohio Adm. Code 3745-55-13(A).

At the outset, we note the portions of the Ohio Administrative Code, which appellants contend are pertinent, were adopted in accordance with R.C. Chapter 119 and pursuant to R.C. 3734.02 under the rule-making powers of the Ohio EPA and, as such, merely supplement, not change or supersede, the relevant sections of the Ohio Revised Code. R.C. 3734.05(D)(1) governs the power of the Ohio EPA to issue operation permits to hazardous-waste facilities which were "in operation" immediately before October 9, 1980.

Appellants argue that the words "in operation" are defined in Ohio Adm. Code 3745-50-40(G), which provides that:

"As used in this rule, 'in operation' refers to a hazardous waste facility which was *receiving* hazardous waste pursuant to a permit or approval issued by the state or for which construction had commenced. * * *" (Emphasis added.)

This interpretation of the phrase "in operation" restricts the ability of the Ohio EPA to issue permits to hazardous-waste facilities which are receiving hazardous waste. Appellants' interpretation is misplaced. Understood in the context in which it is found, Ohio Adm. Code 3745-50-40(G) expressly provides that the definition of "in operation" therein is to be applied only to "this rule," namely, to Ohio Adm. Code 3745-50-40. Under that definition, a plant *receiving* hazardous waste immediately prior to October 9, 1980, is "in operation" and, consequently, is subject to R.C. 3734. 05(D). Ohio Adm. Code 3745-50-40 requires hazardous-waste facilities in operation immediately prior to October 9, 1980 to file "part A" of the permit application pursuant to Ohio Adm. Code 3745-50-40(G). "In operation," *as used in this rule,* refers to hazardous-waste facilities receiving hazardous waste pursuant to a permit. In other words, for purposes of that rule, hazardous-waste facilities were "in operation" prior to October 9, 1980 if they were receiving hazardous waste pursuant to a permit. It is clear that Ohio Adm. Code 3745-50-40 relates solely to the time that a hazardous-waste facility that was in operation prior to October 9, 1980 should submit an application and does pertain to the question of whether a facility continues to be "in operation" after October 9, 1980. Under the Ohio Adm. Code 3745-50-40(G) definition, the hazardous-waste-disposal facility at Vickery, Ohio, was in operation immediately prior to October 9, 1980, and was subject to R.C. 3734.05(D)(1) and Ohio Adm. Code 3745-50-40.

A different rule, *viz.,* Ohio Adm. Code 3745-50-10(A)(41), is applicable when determining whether the hazardous-waste-disposal facility at Vickery, Ohio, *continued* to be in operation after October 9, 1980. Ohio Adm. Code 3745-50-10(A)(41) also defines "in operation," but in different terms than the Ohio Adm. Code 3745-50-40(G) definition. Thus, a facility "in operation" is "a facility which is *treating, storing,* or *disposing* of hazardous waste." (Emphasis added.) Under this definition, the hazardous-waste-disposal facility at Vickery, Ohio, has continued to be in operation since it treated, stored and disposed of hazardous waste even when it did not receive any.

Based upon the evidence before the EBR, the CWMH, Inc. facility was receiving hazardous waste immediately prior to October 9, 1980, and as a result was in operation immediately

prior to that time, and, although the CWMH, Inc. facility did not accept new hazardous waste for a period of the time after the interim status had been properly granted, that did not affect the status of the facility as being "in operation." The CWMH, Inc. facility continued to be "in operation" as that term is defined under Ohio Adm. Code 3745-50-10(A)(41), since it stored, treated and disposed of hazardous waste.

Appellants also argue that, since the Vickery site did not receive hazardous waste for a period of time greater than ninety days, the closure requirements under Ohio Adm. Code 3745-55-13(A) were "triggered."

Pursuant to R.C. 3734.12(D)(8), and in accordance with R.C. Chapter 119, the Director of the Ohio EPA shall adopt, modify, suspend or repeal rules establishing performance standards for owners and operators of treatment, storage and disposal facilities necessary to protect human health or safety for the environment, including closure and postclosure care of a hazardous-waste facility where hazardous waste will no longer be treated, stored or disposed of.

Accordingly, Ohio Adm. Code 3745-55-10 through 13 were adopted to require hazardous-waste facility operators to submit a written closure plan to be approved as a part of the permit issuance process and to treat, remove from sight, or dispose of onsite, all hazardous waste in accordance with the approved closure plan within ninety days after receiving the last shipment of hazardous waste or within a longer period of time if approved by the Director of the Ohio EPA. Consequently, closure is triggered by the submission of a plan for approval and not by the non-receipt of hazardous waste for a period of time in excess of ninety days. The mere fact that CWMH, Inc. was not receiving hazardous waste did not trigger closure. No plan for closure had been submitted or accepted and the facility was continuing to treat and dispose of hazardous waste.

As indicated above, there are two definitions of "in operation" in Ohio Adm. Code 3745-50 — one in Ohio Adm. Code 3745-50-10(A)(41) and the other in Ohio Adm. Code 3745-50-40 (G). The latter definition (3745-50-40 [G]) applies only with respect to special rules pertaining to facilities which were in "in operation immediately prior to October 9, 1980." Ohio Adm. Code 3745-50-40(A). The other definition (3745-50-10[A][41]) is the general definition since Ohio Adm. Code 3745-50-10(A) provides:

"(A) As used in the hazardous waste rules:

"* * *

"(41) 'In operation' refers to a facility which is treating, storing, or disposing of hazardous waste."

Accordingly, the EBR correctly used this definition when applying Ohio Adm. Code 3745-50-41 and R.C. 3734.05.

Accordingly, appellants' first assignment of error is not well-taken.

Appellants, in their second assignment of error, contend that EBR erred in finding that the Director of the Ohio EPA lawfully issued a permit asserting that the terms and conditions of the new permit were modifications of the terms and conditions of the former permit rather than revisions and, as such, required approval by the Hazardous Waste Facility Board ("HWFB"). Appellants contend that the director proceeded to treat the application as a revision but that the permit, as issued, did not comply with that classification but, instead, was a modification of the original permit.

The permit-change request specifically included a decrease in tank storage capacity, a decrease in

injection-well disposal capacity, a decrease in surface impoundment storage capacity and several changes in process code designations to more accurately describe the process in use or to correct for errors in the previously issued "part A" permit. Appellants also contend that the change in ownership of the Vickery facility is a modification rather than a revision.

R.C. 3734.05(G)(4) defines the procedures to be followed when obtaining a permit renewal and requires that permit renewals which contain a modification shall be acted upon by the HWFB as directed in R.C. 3734.05(C). Renewals which require mere "revisions" are not subject to the more rigorous screening procedures outlined in R.C. 3734.05(C) and may be approved by the director as was done in this case. R.C. 3734.05(H) states:

"(1) As used in this section, 'modification' means a change or alteration to a hazardous waste facility or its operations that impacts on the siting criteria contained in division (C)(6) of this section. 'Revision' means any change or alteration to a hazardous waste facility or its operations that is not a modification."

R.C. 3745.05(C)(6) lists those criteria which must be met in order for a new facility to receive a Hazardous Waste Facility and Operation Permit and which, under R.C. 3734.05(H), must be impacted upon in order for a revision in a permit renewal to rise to the level of a modification and which are, in pertinent part, as follows:

"(6) The board shall not approve an application for a hazardous waste facility installation and operation permit unless it finds and determines as follows:

"(a) The nature and volume of the waste to be treated, stored, or disposed of at the facility;

"(b) That the facility complies with the director's hazardous waste standards adopted pursuant to section 3734.12 of the Revised Code;

"(c) That the facility represents the minimum adverse environmental impact, considering the state of available technology and the nature and economics of various alternatives, and other pertinent considerations;

"(d) That the facility represents the minimum risk of:

"(i) Contamination of ground and surface waters;

"(ii) Fires or explosions from treatment, storage, or disposal methods;

"(iii) Accident during transportation of hazardous waste to the facility;

"(iv) Impact on the public health and safety;

"(v) Air pollution; and

"(vi) Soil contamination.

"(e) That the facility will comply with Chapters 3704., 3734., and 6111. of the Revised Code and all rules and standards adopted under those chapters;

"(f) That if the owner of the facility, the operator of the facility, or any other person in a position with the facility from which he may influence the installation and operation of the facility has been involved in any prior activity involving transportation, treatment, storage, or disposal of hazardous waste, that person has a history of compliance with Chapters 3704., 3734., and 6111. of the Revised Code and all rules and standards adopted under those chapters * * *."

In other words, if a change or alteration to a facility or its operations *impacts* on any one or more of the siting criteria listed above, the change or alteration is a modification and must be approved by the HWFB before a new permit is issued. Every permit revision (change or alteration) is, in the broad sense of the word, a modification, but R.C. 3734.05(H) restricts the ordinary meaning of "modification"

and requires that only those changes which impact on the siting criteria listed in R.C. 3734.05(C)(6) are to be termed a modification and affords such a modification different treatment from any other "revision."

The term "impact" as it is used in R.C. 3734.05(H) is not specifically defined in the statutes or in the Administrative Code, but we find that in order for a change or alteration to "impact" on the siting criteria so as to rise to the level of a modification, it must significantly affect one or more of the siting criteria.

Arguably, the "impact" can include all changes or alterations in a facility's operations which have either a positive or an adverse effect. However, R.C. 3734.05(C)(6)(c) requires "minimum adverse environmental impact." Moreover, Ohio Adm. Code 3745-50-51(B)(1)(c) lists as an example of a "modification" a facility seeking a permit for disposal or treatment methods which are different from existing ones and which present a potential "increased risk of hazard." See, also, Ohio Adm. Code 3745-50-51(B)(1)(f). Neither the Administrative Code nor the statutes require permit renewals, revisions or modifications when a hazardous-waste-disposal facility reduces its operations. A permit to operate a hazardous-waste facility details the maximum number and types of operations which are allowed, and nothing prevents a hazardous-waste-disposal facility from voluntarily and unilaterally reducing either the quantity of waste handled or the operations it conducts to handle that waste. Presumably, therefore, the term "impact," as it is used in R.C. 3734.05(H), connotes "adverse impact" and not merely any impact. In other words, a change is not a modification unless it presents an increased risk of adverse environmental effect. It is only when the change has such an effect that ad-

vance approval by the board is required.

Even assuming that reducing operations is a change or alteration in operation as contemplated by R.C. 3734.05(H), R.C. 3734.05(C)(4) requires that the permit applicant, the staff of the Ohio EPA, certain government officials or representatives of a governmental body or "(d) [a]ny other person who would be aggrieved or adversely affected by the proposed facility" are parties to an adjudication. Clearly, the appellants in this case are not aggrieved or adversely affected by a change or alteration which does not adversely impact on the siting criteria and, therefore, have no standing to raise the issues if the changes or alterations do not adversely impact on the siting criteria. Thus, we need be concerned here only with those changes which *adversely impact* on the siting criteria which appellants contend should have been treated as modifications and not revisions.

The EBR found, and the record adequately supports those findings, that the CWMH, Inc. facility had used tanks as part of its waste treatment operations in the past and the number of those tanks so used had not changed and, as a result, the siting criteria were not affected. The EBR correctly found that a change in a code more nearly to describe the operations at the facility and within the tanks does not adversely impact on the siting criteria in R.C. 3734.05(C)(6).

Additionally, the EBR found that neither the change in the facility contact person nor the change in the ownership of the facility from one subsidiary of Chemical Waste Management, Inc. to another adversely impacted upon the siting criteria. Ownership is not a criterion listed under R.C. 3734.05(C)(6), and the record reflects that Chemical Waste Management, Inc. bought the facility in 1978 and,

although title has changed within the family of companies which are subsidiaries of Chemical Waste Management, Inc., there is no evidence to show that ownership, management, control and contact person at the facility have changed.

Consequently, it was not error for the EBR to conclude that the changes did not impact on the siting criteria in R.C. 3734.05(C)(6) and were revisions rather than modifications which would have required the approval of the HWFB.

Appellants contend that the findings of fact of the EBR contain certain conclusions. Although true, this does not require reversal. The conclusory statements were also contained in the conclusions of law. The findings of the board are supported by reliable, probative and substantial evidence and are in accordance with law.

In light of the foregoing, appellants' assignments of error are overruled and the decision of the Environmental Board of Review is affirmed.

*Decision affirmed.*

STRAUSBAUGH and MCCORMAC, JJ., concur.